It arises out of a series of events that occurred in Camden when large sections of the... Mr. Mattioli, I think the court knows the facts of this case. And I want to bring you down to what I consider to be the bottom line, if you don't mind. No, that's fine, Your Honor. As I read the district court's opinions, she ruled in your favor on everything except the issue of double recovery. Am I correct in that? She said that New Jersey would permit collateral source, New Jersey would permit a separate action under subrogation. She ruled legally on every one of the issues that you raised. And then she got down to the bottom line and she said, but we can't give you the damages that you are seeking, the six million some odd damages, because that would constitute a double recovery. Now, are you and I on the same page on that? Do you agree with what I've just said? I do agree with what you've said, Your Honor. All right. After having read that, I went through the claims that you made and the literature that you received from the insurance company, which settled with you for seven million some odd dollars. About 7.3 million. You had a replacement policy for 14 million. You put in a claim for about $14 million. And they not only gave you the seven million, but they also gave you a subrogation right if you wanted to pursue anything further. Am I correct? That is correct, yes. And in pursuing what you considered to be another person that could pay your expenses and your damages, you filed a claim for the damages that you sought were six million some odd dollars, because it was different than replacement damages. Am I correct in that? As the claim was presented against the torch feesers. That's correct, because that was calculated on the basis of replacement value minus depreciation on varying cycles. Well, now may I tell you what bothers me? And that is that no matter how I went through the record, I could not determine that the six million dollars was a double recovery of the seven million dollars, because the figures and the items just don't match. And I don't know what evidence there could have been that there was a double recovery, because the claim that you were initially put in on November the 14th, and supplemented by the one that followed it, does not itemize these items, and I can't tell that you were paid twice for the same item. Let me put it that way. Now the district court judge said that you didn't provide a factual basis contesting double recovery. That was the bottom line of her opinion. And I was hoping that you might react to that, and you might tell me where I can find in the record the double recovery that the district court found. Well, Your Honor, at least we believe that there was no double recovery. Consequently, I can't help you on that, although I can say this. The way the damages against the insurance company are calculated is not entirely different, but in a sense is. The whole point of this is that we bought an insurance policy that provided for replacement value for look. We submitted against the insurance company in those claims replacement value damages in excess of $14 million against a policy limit of $15 million. The insurance company, of course, looked to whatever defense was attached to that claim. As a result of negotiations, there was a settlement, and the settlement was for roughly half of the amount that was submitted in our claim under the policy. And I would submit that all of that is basically... So you settled for half of what you initially claimed, the $14-15 million initial claim, and now you're saying you're entitled to the other half from the tort fee source. Well, not exactly. After settling for $7 million free. It doesn't work quite that way. I've spent a lot of time trying to figure out what the argument is. It seems to be shifting from what it was at the district court. Now you're saying, hello, we were only given half of what we initially claimed, right? That's what you're saying. You're saying you're entitled to the depreciated value of the property from the tort defendant, and recovery of that would not be a double recovery because Lexington only paid half of the replacement cost you initially claimed, correct? That's your argument. Well, our settlement is that Lexington gave us the $7.3 million, plus relinquished its subrogation rights, which it otherwise would have had, not just in equity but because of the language in the insurance policy itself. Let me ask a question in English because I have difficulty with insurance cases. They scare me to death. What evidence is there of damages that were not already compensated by Lexington's payment? If you take the total aggregate of the $7.3 million plus the subrogation rights, then the answer would be none because we have, in actuality, we still wouldn't have gotten a full recovery because, as it turns out, I mean specific items of damage. Talk to me about demolition. Talk to me about what was not covered, what was not compensated by Lexington's payment to you. Well, I'll give you one example that I can come up with which is at least fairly clear, and that is we lost the crane. Replacement value of the crane was approximately $2 million. The appreciated value of the crane because of its age and condition was only about $200,000. So now from Lexington, we were entitled to get the full $2 million, assuming we're correct in our valuation. In the third-party recovery claim, we could never get $2 million. We could only get the appreciated value. Your whole claim is based on your say-so in the initial claim. We said it was worth $1,450 million. Therefore, it is. And therefore, even though we settled all claims arising out of the collapses under the policy for $7.3 million, we only got half as much as we are entitled to, and now we're going after the tort fees for everything up to the $7.3 million. Anything under the $7.3 million would not be a double recovery. The way this works, Your Honor, is the damages under the insurance policy are separate. I understand. But you still haven't told me what damages you have that weren't compensated by Lexington's payment. What hasn't been compensated is we have submitted claims against Lexington for over $14 million, and the claim submission is in the record. The claim submission, which had to be amended a number of times as the submission underwent to Lexington Insurance Company, and that claim was adjusted with Lexington. It sounds like you want the defendants to pay you the balance of your policy. Well, if Your Honor pleases, I think we've got to look at something else before you can get to that, and that is this. The defendants are tort fees against whom claims have been lodged. Talk into the microphone. I can't hear you. The defendants are tort fees against whom claims have been lodged. If you have filed this, forget insurance for a moment. You have no insurance policy. You sued the defendants. How much could you get? From the defendants themselves, based on the way this claim has been developed and presented, approximately $6.3 million. Because that's actual value. That's correct. All right, but didn't you get that from Lexington? We got from Lexington only half of what we say we were entitled to. But you settled for it. It was replacement cost. No, if Your Honor pleases. That's what the policy covered. The policy covered replacement cost. Now let's assume for a moment that Your Honor's correct, all right? The point that nevertheless remains, why do we not have a right to recover against the tort fees even if it represented a double recovery? And the answer to that is this. First of all, the whole point of the case was that the collateral source document says that we can recover from our own insurance company, keep the money, and still recover from the tort fees. Now there's been a suggestion that, well, the collateral source doesn't exist in this case. I submit that's not correct. It does exist in this case. Under normal circumstances, regardless of the amount of money we received from the insurance company, it would have been subrogated to a portion of whatever the recovery was. So that in this case, because we settled for approximately half of what our claim was, absent the settlement provision relinquishing the subrogation rights back to South Jersey Port Corporation, we got 6.3 if the lawsuit proceeded at that point against the tort fees. And there was a recovery. Whatever that recovery was, under the contractual provisions of the insurance policy, half would have gone to South Jersey, half would have gone to the insurance company. Now supposing, Mr. Mattione, I pronounced your name correctly? That's correct. Supposing that you did not bargain for the subrogation rights back to you as part of your settlement. Now you have Lexington with a subrogation right. They took that right and sued all the defendants in their own name, standing in your shoes. All right? That's the posture. How much could Lexington recover from the defendants? From the defendants? How much they can prove as we say? Well, they can recover what you can recover. That's correct. And you can recover 6.3. So Lexington is limited to 6.3. So how can they give you under subrogation more than they can recover? They haven't, Your Honor. But that's what you say they can. They've given us the right. The point is that, with all respect, I have to correct one point. If there was no relinquishment of subrogation, Lexington could only sue in its own name for what it could recover, but we would be also a party to that litigation because we would say we didn't get our payment in full. And so we would proceed jointly. They would sue in either name or both names, but as real parties of interest, the recovery that could be had would be limited to the 6.3. See, I think you had a very clever settlement in this case, but I'm wondering why they, the defendants, should pay you more than they would have paid had you sued them directly. We're not asking them to pay. They haven't paid a dime yet, Your Honor. They walk away scot-free. They haven't paid anything. The point is that, absent the relinquishment of our subrogation rights back to us, we sued together. Excuse me. The maximum they're liable for is $6.3 million. They are, yes. You already got that. We did not get $6.3 million from them. Oh, you got $7.3 million. We got $7.3 million from an insurance company for whom we paid almost $400,000 in premiums for that one year alone. Lexington, there may be a very simple answer. Lexington, on the settlement, paid you $6,303,796 plus interest for a total of $735,315.96, right? Correct. That's the same figure. The $6,303,000 that you were paid by Lexington on the settlement is the same figure that you submitted in this action on your statement of damages in February 18, 2005. $6,303,000, correct? It's the same thing? It's a different composition. That $6.3 does not include interest. No, I know that. I'm saying it's the total damages you submit here on the statement of damages at 839 of the appendix is $6,303,796.30, correct? And it's the same amount that Lexington paid you without the interest on 423.04 when you settled. The same $6,303,000. And I just, Your Honor... Down to the penny. That I can't answer, Your Honor. I don't have the exact language, but in the settlement agreement that you entered into with Lexington, you settled for any and all claims arising from the damage to your peer. Any and all claims. Under the policy. Because there's a difference, Your Honor. Under the policy, it's replacement value, and against the court cases, it's not. There are occasions when in the maritime you can recover replacement value, but this is not one of those cases. And so the question still remains that if we had not settled as we did with Lexington and just going back to Your Honor's example of Lexington suing, Lexington would have been suing in its own behalf as well as us, or we would have joined with them. Or if we were suing in our own behalf, we would have been suing for them because any recovery that we received that exceeded the insurance benefit that we received would have to go back to Lexington. So what you're really suing for, I mean, when you talk about double recovery, you've already recovered for the actual cost, which is what you would be entitled to. What you want, the difference between what you receive from the insurance company and what you pay premiums for under the policy. Except that Lexington has relinquished its rights to us so that we believe under the status of the settlement as it presently exists, we're entitled to proceed against the court cases and recover whatever law allows us to recover. But it seems like you're trying to recover the difference between the insurance policy and the amount that Lexington pays you. Well, you don't know what the number ultimately will be, Your Honor, but based on this record, that's what it looks like. What we're saying is that we can't have a double recovery unless we've gotten enough money to pay off what we should from our perspective. I can't hear what you're saying because you're not talking into the microphone, Mr. Mattione. I'm sorry to interrupt. You're saying your total uncompensated loss is $7,436,585. I'm asking you, where do you get that figure? What is that comprised of? You're talking about from the settlement with the insurance company? Yes, you're saying your total uncompensated loss here is $7,436,000. Where do you get that from? Just because you initially claimed $14-$15 million and this is the difference between what you claimed and what you settled? And that makes it a loss. That's the facial position at this point, yes, Your Honor, because we submitted a replacement value claim for $14-plus million. As a result of that, it was a negotiated settlement  There were a variety of arguments. For example, they claimed that all the damages were where is their debt. But your statement of damages is $6,303,000 and that's been paid. The damages have not been paid by the tort fees. We settled with the insurance company on a negotiated settlement basis. On the same damages, or at least... The damage, forgetting about the numbers for a moment. You can't forget about the numbers. Well, I have to say that the damage itself, the physical damage, is exactly the same. We have two piers collapse. We have a crane that topples into the... So that's why I keep asking, and I won't ask it again. What damages have you... What additional damages are there that you have not been compensated for? And this is precisely why Judge Wilson found any additional... There was no evidence to support that. So any additional recovery would be a double recovery because you've already been fully compensated. Your Honor, please just... Assuming the complete directness of what you just said, we are still entitled to recover from the tort fees because they have not paid anything and absent our deal with the insurance company, which we paid for. If you, as you say, you sue the defendants and the maximum you can get is $6,300,000, and if that were played out before a jury, you'd get $6,300,000. Wouldn't they be entitled to an offset for monies already received under your insurance policy? No, Your Honor, because of the collateral resource rule. And to suggest that the collateral resource rule doesn't have any vitality in New Jersey doesn't make sense because otherwise there's no reason for having the whole concept of subrogation. The whole point of subrogation is that when you get a recovery that exceeds what you got paid from the insurance company, you got to pay them back. We've let you go much too long. I'll get you back if you're bothered. I want to ask one question which can be answered for me when you come back. Judge Wilson, in her opinion of August 1, 2006, said, I find that the plaintiff has failed to raise a material factual dispute as to the defendant's assertion that Lexington's $7,300,000 payment fully compensated the plaintiff for all of its losses arising out of the collapse. Now, that's a finding that she made, and she says that there was no material factual dispute that you made of that. In her last opinion, she said, I found that the plaintiff had failed to present competent evidence of the existence of any losses not already compensated by Lexington's $7,300,000 payment. Now, if those two statements are in error, I want you, when you come back on rebuttal, to tell me the evidence that you had that shows that those two statements were in error that you did make a material factual dispute and that there are items which the $7,300,000 did not pay for. Good morning, Your Honors. Good afternoon, Ms. Reagan. Is it afternoon now? Yes. If it pleases the Court, I am arguing on behalf of Weeks Marine on the issue of strict liability. Strict liability? On the strict liability issue, unless you wish not to hear that. Well, you know, if we address the issue of preemption, do we really get to strict liability? No, you don't. Unless, you know... Oh, I'm sorry, yes. No, you don't, and I believe that that is actually, you're looking at exactly the right thing, Your Honor, irrespective of state law. Yeah, the District Court did it the other way, but... She did, and I found that a little strange, but she's entitled to do it that way, but I think irrespective of state law, New Jersey hasn't spoken on it, that strict liability for abnormally dangerous activities is preempted by general maritime law. Now, I understood you to be arguing also on behalf of Hill International. Are you, and they're, of course, not involved in the strict liability claim. That's Mr. Cattell who will be talking on the other issue. It was incorrect. Essentially, Judge Fuentes, you're absolutely right. Under Grubart, there's no question that in this exact situation, piledriving, damaging a shoreside facility, that maritime law applies. There is no dispute, I don't believe, that general maritime law does not recognize strict liability for abnormally dangerous activities under the restatement, and if state law, if New Jersey decided that piledriving was something for which strict liability should be applied, which it has not, if that was the case, that would directly conflict with general maritime law and uniformity because many of our states, Delaware and Pennsylvania, are separated by the Delaware River from New Jersey, and you can't have different laws or different standards of liability applying to maritime cases in different locations. Judge Garth, you in Yamaha v. Calhoun in the post-Supreme Court decision specifically said you have to apply general maritime law to the liability aspect of the case, even if perhaps the remedies in some situations state law could be applied. Unless you have any questions for me on the strict liability issue... No, we have conferred and we do not. Thank you. I will cede the rest of my time to Mr. Cattell. Thank you. Good afternoon. May it please the Court, I'm Edward Cattell. I'm addressing the double recovery issues on behalf of S.P. Hudson and also Weeks and Hill because they have had a summary judgment in their favor on the same issue. There are really four issues here that were addressed in the briefs. The concept of double recovery, the issue of collateral source, the assignment of a tort claim, and then in the Hudson appeal, which is the second appeal which is consolidated, the issue of abuse of discretion and the denial of attorney's fees or sanctions. If all Mr. Mattione did with Lexington is go for a replacement value, which was the policy, it's going to take me $14 million to rebuild this pier. Not the value of it, but that's what it's going to take to replace it. So he got 7.3. Why couldn't he go after the rest? Maybe he wants to get that pier back the way it was before. Well, they filed a claim. They said, hey, it's worth $14 million or $15 million. Lexington said, there's no coverage, or even if there is coverage, it's limited to a $5 million sublimit. So we've got all or nothing, $15 million on the one hand, zero. They came to a settlement. $7.3 million for full and final settlement of all claims. That's between he and insurance company. Under the policy. Under the policy. All claims under the policy, $7.3 million. Plus subrogation. Well, they start off, step one, we've got a number here, $7.3 million. And they said, now, we'd also like these subrogation rights assigned back to us. Well, if the, Lexington had not assigned the subrogation rights, but it said, we're going to pay you $7.3 million, and that's it. You can take it or leave it. And they took it. It would be a different case. But Lexington didn't say that. It said, we're going to pay you $7.3 million. I don't know what for. Because I've been through the record and I can't figure out what they paid it for. And I've asked Mr. Mattione to furnish that information. And they said, but in addition, we're going to give you the subrogation rights if leaving something open. And that's the problem. That's why we're here today. If they didn't do that, we probably wouldn't be here. Well, let's consider what the settlement agreement does not say. It does not say, we're settling this case for $13.6 million. And it will be paid as follows. $7.3 million to cover your policy rights over and above the $6.3 million that you can recover from the tort fees. And to give you that, which we're not going to pay you, we will waive our subrogation. Well, it doesn't say that. But it is a replacement policy for which premiums were paid and it's worth $14 million. But the claim, whatever the claim, that $14 million claim got reduced down to 7.3. We don't know that, though, because the insurance company on December the 13th, 2001, originally offered them $1,364,743. Ultimately, they paid $7.3 million. But we don't know what items comprised that $7.3 million. At least I can't tell. Are they the same items that I was referring to that appear in the Statement of Damages that was filed February 18th, 2005? Because it's the identical total. You say that the $6.3 million in the settlement, without the interest, reflects the actual cash value of first one and two at the time of the collapses as measured by replacement costs less depreciation, correct? Yes. To answer Judge Barth's question, would not what Lexington paid be those same items mentioned in the Statement of Damages? It is. The proof of claim, item by item, and Judge Wilson, in her opinion, compared the original $14 million proof of claim. Item by item, every item is identical. The only thing that changed between the original proof of claim and the Statement of Damages is the amount. And that is what led Judge Wilson to say. What it seems to me to be, but that's why I keep asking, what in addition to these items, they have not received compensation? Nothing. They've received actually excess compensation for each of those items. Any assessment made for replacement value? I'm sorry, Your Honor? Was there ever an assessment made for replacement value? There was a claim made under the policy. There were various estimates of what things would cost. The $2 million for the claim in all of our litigation here, we never really addressed whether $2 million was a realistic number because in this litigation, replacement value was irrelevant. The $6.3 million was a number which South Jersey Court came up with. Our numbers are much lower. But if Lexington paid the $6.3 million, it had to be because of replacement value because that's all the policy covered other than some minor items, correct? They weren't paying for pain and suffering. No, no. It's purely a property damage claim. Replacement value, really. Well, replacement value as Lexington saw it. As Lexington saw it and as the plaintiffs agreed, essentially, by the statement of damages and the sum. Now, another issue, a statement was made by Judge Garb that South Jersey Court won on the collateral source issue. I think what Judge Wilson actually held, this is at page 19 of her opinion, footnote 15, that collateral source rule only applies to personal injury claims in New Jersey. It does not apply to property damage claims. So they get no benefit out of the collateral source rule. You guys get off scot-free, don't you? I mean, you caused all the problems. Well, you are. You don't have to pay anything. Let's look at the hierarchy of public policy in New Jersey. Every single separation case starts off saying no double recovery. New Jersey then passed a statute to do away with the collateral source rule. And in the case of Herrera v. Reddiger, a Supreme Court case which we cite, they go through an analysis of what's behind that statute. So this would be public policy number two in New Jersey. Liability insurance rates are skyrocketing. We've got to do something about them. Isn't it also a public policy to make the wrongdoers pay for their sins? To shift the risk away from liability carriers such as Insure, Hudson Weeks, and Mill and move that over to the carrier on the other side, the property damage carrier. That's public policy. The cost of liability insurance was becoming prohibitive. Companies that needed it couldn't get it. The state had to do something to bring that down. And this policy is articulated by the Supreme Court. Now, number three, windfall. Do the tortfeasors walk? That claim was in the hands of Lexington. Mr. Cattell, tell me what case in New Jersey says that there can be no double recovery because the cases I've read seem to waffle back and forth between them. Well, I would start off by saying the standard accident versus Palencia. Where do I find it? Standard accident versus Palencia is 15, New Jersey, 162. That was a 1954 case. 1954 case. Even older than me. Which is cited, not older than me, I remember it well, which is cited by all, every case that talks about subrogation starts with quoting Palencia. The doctrine of subrogation exists so that the plaintiff won't have a double recovery. And then they move on from there to discuss other issues. But that, of course, where there, well, I'll get to where there is a double recovery because I'm looking at their original claim and the material that Judge Barry was speaking with you about, and they do not jive one with the other. I still can't tell what the, what was paid for in the 7,000,003. In the proof? Because, for instance, the peer one and two birth is listed in the damage claim that Mr. Mattione submitted on February 18, 2005 as 2,587,462. Yet that figure doesn't appear any place in their original claim where they asked for the replacement of it. And they, it, I can't tell what has been double recovered. Well, the original claim, the proof of claim said we need to replace births one and two. That'll cost $7 million. Yeah, but how much did the 7,000,003 pay? What items did the 7,000,003 pay for? To be a double recovery, it's got to be, the same item has got to be paid for twice. Can you point to anything in this record which shows that the items that the 7,000,003 paid for are the same items that are being sought to have you pay 6,000,003 for? I looked at the proof of claim which said we want 14 of them. No, can you tell me? I want to know. This is the very first question I ask. What items are being paid double for? Can you tell me? For every item which is recovered, which they seek in their statement of damage, they've been paid for. Every single item they've been paid for. Every, you mean that 14 million claim that the 7,000,003 paid for each item there? Each item that they numerated. I didn't gather that from the papers, but if you're right, there's no listing of that, is there? I thought the 7,000,003 was a negotiated amount. The 7,000,003 was a negotiated amount. Well, you settled something, and you're telling me that because they paid 7,000,003, they paid for everything that the 14 million dollar claim asserted? Yes. They settled in full all of their claims. I understand your position. And the moment that Lexington paid, Lexington owned the claim. But South Jersey Court wanted to bring the claim, so they asked for it to be assigned back. So the tort claim was assigned back to them. And South Jersey Court has said throughout this litigation, we stand in the shoes of Lexington, and what we are trying to collect is what Lexington could have collected. What Lexington could have collected from the alleged tort fees is damages less depreciation. That is exactly what South Jersey Court is seeking to collect by way of the assignment, which we argue is improper because it's an assignment of the tort claim. If there had been no subrogation rights, Lexington Insurance could have filed a suit against the defendants and obtained how much? Lexington could have sued the tort fees for damages, which is replacement cost less depreciation, which is the 6.3. So is that what pretty much had been assigned in the settlement? That's what was assigned. To South Jersey? Lexington, having looked at the merits of this claim, walked away from it. They said it's worthless. We don't want it. So is it your view that Lexington subrogated to South Jersey a claim worth $6.3 million? Yes. 7.3 or 6.3? 6.3. 6.3. All they can recover from us is 6.3. So South Jersey takes that subrogation claim and files a suit, but it had already received the 6.3. They received that 6.3 plus an extra million. All right. I think we've understood your position. Thank you, Your Honor. Judge Barth, I can't specifically answer your question, to be honest with you. However, as we view the damages as presented, we presented a claim against the insurance company for $14-plus million. That claim, while elements of it are similar to or even identical in terms of what was actually damaged, what physically was damaged, the numbers are different because the measure is different. I'm sure the number is different, but shouldn't there be, if the determination of this case is that there was a double recovery and you still haven't answered my question as to whether there was evidence of your factual dispute with that, but if that is the case, shouldn't a district court judge determine what elements were paid for by Lexington and what were sought from the tortfeasors to determine if there was a double recovery? Without that, how do you get being paid twice for the same nuts and bolts? Well, you haven't been paid twice yet. No. You're looking to be paid twice. We don't think we'll ever get people paid twice, Your Honor. I keep going back. I think we're asking the same question. We're not getting an answer. Why wouldn't you be paid twice? What evidence is that you would not be paid twice? Because that's all the district court said. There's no material factual dispute here that you haven't been fully compensated. And she begged you to give her evidence, and you didn't. Our answer is that the proof of claim submitted to the insurance policy In 2001 is your only evidence. That's 824. Your only evidence. That evidence. That's it. Plus the fact that there's, well, that that's the main evidence. That's our estimated loss based on the insurance policy. I would like to address one other point, if I may. This question about the reference to standard action in an insurance company case actually also stands for the proposition that rights of subjugation may be modified by contract. And very important to this case, the Coulter case, which in that case allowed the insurance company to be over. The property damage insurance company to be overcompensated based on the settlements with the tort abusers and left the residential property owner with the woefully undercompensated. The Supreme Court in New Jersey said that was fine because it could be modified by contract, which is precisely what we did here. Whether you call it an assignment from the insurance company back to us or some other name, it's still a contractual adjustment of the subjugation right. You actually sued Lexington, didn't you? That's correct. Was it a declaratory judgment action? I believe so. But that was settled, but it was settled in the New Orleans case. But in your pleadings, what did you seek? Just a declaration of coverage or did you seek? Well, we sought the $14 million plus in damages. The policy. Okay. Thank you. Very well argued case. We will take it under advisement. And will the clerk adjourn court? He's right. This court stands adjourned until Thursday, November 6th at 10 a.m. Thank you.